**Hilbert L. BRADLEY, Thomas Z. Lewis, Barbara J. Cox, John Henry Hall, Imogene Harris, James T. Harris, Katie Hall, Henry E. Bennett, Edward D. Hegwood, and Karen Pulliam Willis, Plaintiffs,**

v.

**Frederick T. WORK, Anna N. Anton, and Jerome Reppa, in their official capacities as members of the Lake County Election Board, and Anton in her official capacity as Clerk of the Lake County Circuit and Superior Courts, Defendants,**

**Randall T. Shepard, Harold Abrahamsom, Angelo Buoscio, Donald P. Levinson, Ruby S. Catlow, and Dean V. White, in their official capacities as members of the Judicial Nominating Commission for the Lake County Superior Court, Intervening Defendants,**

**Morton B. Kanz, James Danikolas, Gerald Svetanoff, James J. Richards, Jeffrey Dywan, Nicholas J. Schiralli, Paul D. Stanko, Bernard A. Carter, Richard W. Marco, James E. Letsinger, Richard J. Conroy, James L. Clement, and Darlene Wanda Mears, in their official capacities as Judges of the Lake County Superior Court, Intervening Defendants.**

No. IP 91–898 C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Feb. 13, 1996.

Stephen Laudig, Laudig & George, Indianapolis, IN, William R. Groth, Fillenwarth Dennerline Groth & Baird, Indianapolis, IN, Hilbert L. Bradley, Gary, IN, for Hilbert L. Bradley, Thomas Z. Lewis, Barbara J. Cox, John Henry Hall, Imogene Harris, James T. Harris, Katie Hall, Henry E. Bennett, Edward D. Hegwood, Karen Pulliam Willis.

Gary P. Price, Lewis and Kappes, Indianapolis, IN, for Hilbert L. Bradley.

Ronald E. Elberger, George T. Patton, Bose McKinney & Evans, Indianapolis, IN, for Randall T. Shepard, Angelo Buoscio, Harold Abrahamson, Ruby Catlow, Dean V. White, Donald P. Levinson, Morton B. Kanz, James Danikolas, Gerald Svetanoff, James J. Richards, Jeffrey Dywan, Nicholas J. Schiralli, Paul D. Stanko, Bernard A. Carter, Richard W. Marco, James E. Letsinger, Richard J. Conroy, James L. Clement, Darlene Wanda Mears.

J. Justin Murphy, Murphy Law Firm, Hammond, IN, for Frederick T. Work, Robert C. Antich, Jerome Reppa.

Edward H. Feldman, Highland, IN, for Robert C. Antich.

J. Michael Katz, Merrillvill, IN, for Anna N. Anton.

## ORDER ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This matter comes before the Court on a motion to dismiss and motions for summary judgment filed by various parties. The intervening defendants have filed a motion to dismiss Count II, and a motion for summary judgment on Counts I and III of the plaintiffs' fifth amended complaint. The Lake County Election Board members have apparently joined the motion for summary judgment, but the record is not clear as to whether they have joined in the motion to dismiss filed by the intervening defendants. In conjunction with their response to the intervening defendants' motion to dismiss, the plaintiffs filed a motion for partial summary judgment on Count II. They also filed a cross-motion for summary judgment on Counts I and III. For the reasons discussed below the Court **GRANTS** the intervening defendants' motion to dismiss Count II, **GRANTS** summary judgment in favor of all defendants on Counts I and III, and **DENIES** the plaintiffs' motions for summary judgment on all counts.

An assortment of motions to strike have also been filed by the intervening defendants, joined by the defendants.[1] The motion to

---

1. Those motions include a December 23, 1993, motion to strike plaintiffs' motion for partial summary judgment for failure to comply with L.R. 56.1; an April 29, 1994, motion to strike plaintiffs' evidence in support of their opposition to intervening defendants' motion for summary

strike plaintiffs' motion for partial summary judgment for failure to comply with L.R. 56.1 is moot in light of the Court's granting of intervening defendants' motion to dismiss Count II. The motions to strike various pieces of evidence offered by the plaintiffs in opposition to or support of the motions for summary judgment are well-taken and to the extent that the proffered evidentiary materials contain inadmissible hearsay, lay opinions, speculations, or conclusions, they are stricken. In addition, because the plaintiffs failed to provide the Court with any sort of guide by which to navigate the maze of evidentiary submissions, or with which to connect the various pieces of evidence with the proposed "material facts related to" the various summary judgment motions, the proffered evidence is less than helpful. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir.1994) (the statements and designations required by local rules provide "roadmaps," without which the court should not have to proceed).

The plaintiffs mistake the Supreme Court's admonition not to apply the *Gingles* factors [2] in a mechanical fashion, for permission to ignore the Federal Rules of Procedure and this District's local rules. The requirements of those rules are aimed at facilitating the use of summary judgments for weeding out claims that are not based on reliable evidence or are factually unsupported. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–34, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Just because the substantive standards in a particular area of law are to be applied in a comprehensive, non-restrictive fashion, does not mean that a party can overcome a well-supported motion for summary judgment

with global citations to general treatises, historical texts, and old newspaper and periodical articles. Rule 56 states that to overcome summary judgment, the non-movant must set forth specific facts supported by depositions, answers to interrogatories, and admissions on file, together with any affidavits, showing that a genuine issue exists.

Plaintiffs' evidentiary materials are not only difficult to comprehend in relation to the briefing submitted, they are also permeated with conclusions about the ultimate facts that must be found in this case in order to establish a violation of § 2. To the extent that the materials contain hearsay, conclusions, speculations, unsupported opinions and statements of fact, the plaintiffs' evidentiary materials will be disregarded. Moreover, the Court will not refer to any evidentiary materials that are not properly designated as supporting a particular material fact. Therefore, defendants' various motions to strike plaintiffs' evidentiary materials, including the disputed affidavits, are sustained in part and overruled in part. With respect to the Voters' thirty-five page brief submitted in response to defendants' filing of supplemental authority, the Court finds that plaintiffs' brief is an unwarranted additional filing in opposition to defendants' summary judgment motion and it should, therefore, be stricken.

## I. FACTUAL & PROCEDURAL BACKGROUND

The plaintiffs are "black citizens, residents of Lake County, Indiana, and registered voters" (the "Voters"). Fifth Amended Complaint (hereafter "Complaint") at ¶ 2. Lake County is located in the far northwest corner

---

judgment for failure to comply with L.R. 56.1 and for containing inadmissible hearsay; a May 12, 1994, motion of the defendants joining in intervening defendants' April 29, 1994, motion; a June 28, 1994, motion to strike the affidavits of Charlie Brown, John L. Howard, Henry Bennett and Dr. Leonard Moore that were filed by plaintiffs in support of their cross-motion for summary judgment, for failure to comport with Rule 56(e); a June 28, 1994, motion by the intervening defendants to strike plaintiffs' evidence in support of their cross-motion for summary judgment for failure to comply with local rules; and a February 22, 1995, motion by intervening defendants to strike plaintiffs' brief in opposition to defendants' submission of supplemental authori-

ty, which brief was thirty-two pages, and contained arguments and factual assertions that are unsupported by citations to evidence.

**2.** *Thornburg v. Gingles*, 478 U.S. 30, 51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986) (First, a minority group must show that it is sufficiently large and geographically compact to constitute a majority in a single-member district; second, the group must show that it is politically cohesive; and third, the group must show that the majority votes sufficiently as a bloc to enable it, absent special circumstances, usually to defeat the minority-preferred candidate).

of Indiana, near Lake Michigan and Chicago, and as of the 1990 census the county contained 475,594 people, 116,688 of whom are African–American (24.5%). Complt. ¶ 6. The voting age population is 342,427, 22.5% of whom are African–American. Defendants Frederick T. Work, Anna N. Anton[3] and Jerome Reppa are the current members of the Lake County Election Board, and are sued in their official capacities. Anton is also the Clerk of the Lake County Circuit and Superior Courts. Complaint at ¶ 3. The intervening defendants include the current or former members of the Lake County Judicial Nominating Commission (the "Commission") and certain of the current or former judges of the Lake County Superior Court (the "Judges" or collectively the "Intervenors").[4]

For purposes of the motion to dismiss Count II, all of the well-pleaded facts in the Complaint will be taken as true. The Voters contend that they and other black citizens have been deprived of a fair opportunity to elect judges of their choice in Lake County. The Superior Court of Lake County consists of four divisions, which includes the civil, criminal and juvenile divisions, with ten judges, and a separate county division, with three judges. Under Indiana law, the judges of the county division are elected by popular vote on an at-large, county-wide basis. The judges of the other divisions, however, are selected differently. If a vacancy occurs in one of those divisions, the governor of Indiana appoints a new judge from a list of three nominees recommended by the Lake County Judicial Nominating Commission, which is established specifically to assist with filling vacancies on the Lake County Superior Court. See Ind.Code §§ 33–5–29.5–28 to 29.5–38.[5]

The Commission consists of a total of nine members under the current law. It includes the Chief Justice of the Supreme Court of Indiana, or his designee, four attorney-members selected by the licensed attorneys of Lake County, and four non-attorney citizens of Lake County. The non-attorney members were appointed by the governor under the old law, but are now appointed by members of the Lake County Board of Commissioners. The Commission members review applications for judicial appointments, assess each candidate in light of statutory requirements, and then recommend the three most highly qualified candidates to the governor. Ind. Code § 33–5–29.5–36(a). The Commission is also responsible for including a written evaluation of the qualifications of each candidate with its list of three recommended candidates. Ind.Code § 33–5–29.5–37.

After a judge is appointed to the civil, criminal, or juvenile divisions, he or she serves an initial term commencing on the effective date of the appointment and continuing through December 31 in the year of the general election that follows the expiration of two years from the effective date.[6] Ind.Code § 33–5–29.5–41. At the conclusion of the judge's term, the judge must submit to an at-large, county-wide retention election in order to serve another term. If the judge fails to win retention a vacancy ensues, and the Commission submits another list of three nominees to the governor who appoints a replacement.

In their Fifth Amended Complaint, which was filed on October 20, 1993, the Voters seek declaratory and injunctive relief to enforce the provisions of § 2 of the Voting Rights Act of 1965 ("the Act"), as amended, located at 42 U.S.C. § 1973. They also seek

---

3. On January 1, 1996, Anna N. Anton became the new Clerk of the Circuit and Superior Courts of Lake County, Indiana, and member of the Lake County Election Board. Because Robert C. Antich was named as a defendant in this action in his official capacity, this Court, on January 17, 1996, ordered the substitution of Anna N. Anton, in her official capacity, for Robert C. Antich.

4. Since the inception of this action Judges Bernard A. Carter and Paul D. Stanko have resigned and Judge Darlene Wanda Mears lost a retention election.

5. In 1995, the Indiana General Assembly amended the provisions relating to the composition of the Commission and the appointment process. Those amendments, however, do not appear to resolve the issues raised by the dispute over Count II of the Complaint, although they impact the resolution of the issues in Count I.

6. Judges in the county division serve an initial term of six years before they must stand for re-election. For both types of judges, each subsequent term is for six years.

to enforce their rights under the Fourteenth and Fifteenth Amendments through the Civil Rights Act located at 42 U.S.C. § 1983 ("§ 1983"). The Voters' allegations are in three counts. Count I alleges that the system for selecting and retaining judges in the civil, criminal, and juvenile divisions of the Lake County Superior Court denies the Voters and those similarly situated to them the opportunity to vote for and to elect judges of their choice in violation of § 2 of the Act and the Fourteenth and Fifteenth Amendments.

In Count II, the Voters allege that the system for selecting the three attorney members of the Commission—an at-large, county-wide election in which only licensed attorneys are allowed to vote—is a standard, practice, or procedure which results in denying black citizens the ability to vote for and elect the four attorney members of the Commission. According to the Voters, that denial violates § 2 of the Act, and contributes to the violation alleged in Count I, in addition to denying them equal rights, privileges and immunities in violation of § 1983 and the Fourteenth Amendment. In Count III, they allege that the system for electing judges of the county division of the Lake County Superior Court—an at-large, county-wide popular election—constitutes a standard, practice, or procedure that dilutes the votes of black voters and impairs the ability of black voters to participate in the political process and elect judges of their choice. Accordingly, the Voters claim that the system of electing judges for the county division violates § 2 of the Act, as well as the Fourteenth Amendment.

On December 3, 1993, the Intervenors filed a motion to dismiss Count II of the fifth amended complaint, to which the Voters filed their opposition on December 20, 1993, and also moved for summary judgment on that count. While those motions were pending, the Intervenors filed, on January 5, 1994, a motion for summary judgment on Counts I and III. The Voters responded with a cross-motion for summary judgment and a brief in opposition to the Intervenors' motion for summary judgment on March 1, and March 7, 1994.[7]

By August 31, 1994, briefing appeared to be completed on the pending summary judgment motions, as well as on the motion to dismiss. Subsequently, however, the parties continued to supplement their prior materials with additional submissions of evidentiary materials and supplemental authority. That activity ceased on or about April 25, 1995.[8] On May 22, 1995, the Voters moved for a stay of all proceedings while they assessed the effect on their suit of new legislation passed by the Indiana General Assembly in April, 1995. *See* House Enrolled Act ("HEA") 1118, passed as P.L. 18–1995.

The relevant portions of the Indiana Code that were amended by HEA 1118, §§ 33–5–29.5–29, 29.5–30 to 32, and 29.5–36, became effective July 1, 1995. The amendments expanded the number of members on the Lake County Judicial Nominating Commission from seven to nine, and made other changes directed at increasing the likelihood of selection of minority judges. The four attorney members are still to be elected from among the Lake County members of the bar, but their selection is now subject to certain limitations. At least one attorney member "must be a minority individual," as defined in the Indiana Code, two members must be women and two members must be men. I.C. § 33–5–29.5–29(b).

The new law also changed how the non-attorney members of the Commission would be selected. Formerly, three non-attorney members were appointed by the governor of the State, a popularly-elected official who is somewhat removed from Lake County. Under the new law, the four non-attorney members are to be appointed by the Lake

---

7. Intervening defendants, joined by the defendants, moved to strike the plaintiffs' cross-motion for summary judgment on April 1, 1994. This Court overruled that motion to strike on April 7, 1994.

8. For purposes of the current motions, this Court has not relied on intervening defendants' supplemental authority filed on January 5, 1996, nor will it address or rely on the authority and arguments contained in plaintiffs' January 18, 1996, response to that filing. Plaintiff has also filed what appears to be a motion to reconsider the Court's earlier order allowing the intervention of the intervening parties. That motion is denied.

County Board of Commissioners.[9] These appointments are subject to the same conditions as the attorney members with respect to appointment of minority individuals and women. The Board of Commissioners' appointment power is further limited by the requirement that each of the three county commissioners appoints one member who is a resident of that commissioner's district. The fourth non-attorney member is to be appointed by majority vote of the Lake County Board of Commissioners. In addition, the law provides that no more than two of the non-attorney members may be from the same political party. I.C. § 33–5–29.5–29(c).

Finally, when compiling its list of three nominees for the governor, the Commission must comply with an additional requirement under the new law. "In determining which eligible candidates shall be recommended to the governor, the commission shall consider that racial and gender diversity enhances the quality of the judiciary." I.C. § 33–5–29.5–36(e). This provision is located in the statutory section entitled "Nominees; requirements of commission."

In light of the changes effected by the new law, the Court granted the requested stay through September 25, 1995, at which time the Voters filed a motion asking the Court to determine that they were prevailing parties for purposes of an award of attorney fees. After more than two months of briefing the prevailing party issue, the Voters informed the Court, via a status conference and an omnibus motion, of their desire to have the Court proceed to resolve the merits of the original dispute. Consequently, the earlier motion to dismiss and motions for summary judgment are now being considered. Further facts will be recited when pertinent to the discussion.

## II. STANDARDS

### A. MOTION TO DISMISS

■ In assessing the propriety of a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations in the complaint and the inferences reasonably drawn from them. *Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 730 (7th Cir.1994). Dismissal is appropriate only if it appears beyond doubt that the plaintiffs can prove no set of facts consistent with the allegations in the complaint that would entitle them to relief. *Hi–Lite Prods. Co. v. American Home Prods. Corp.*, 11 F.3d 1402, 1405 (7th Cir.1993).

■ This standard essentially means that if any set of facts, even hypothesized facts, could be proven consistent with the complaint, then the complaint must not be dismissed. *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir.1995). After the Federal Rules of Civil Procedure were passed in 1938, parties no longer had to plead facts that, if true, would establish each element of a cause of action. *Id.* Instead, plaintiffs "receive the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). However, the Court need not ignore facts set out in the complaint that undermine the plaintiffs' claims, *American Nurses' Ass'n v. State of Illinois*, 783 F.2d 716, 724 (7th Cir. 1986), nor is the Court required to accept the plaintiffs' legal conclusions. *Gray v. Dane County*, 854 F.2d 179, 182 (7th Cir.1988).

### B. SUMMARY JUDGMENT

■ Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

---

9. Members of the Board of Commissioners, who comprise the executive of Lake County, *see* Ind. Code § 36–2–2–2, are elected from each of three different single-member districts within the county. *See* Ind.Code § 36–2–2–4. In Lake County, which has a population over 400,000, a person must be a resident of the district from which he or she seeks election to the Board of Commissioners. Ind.Code § 36–2–2–5(d). However, one member of the executive is elected by voters from all three single member districts. *Id.*

56(c). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A disputed fact is material only if it might affect the outcome of the suit in light of the substantive law. *Id.*

█ The moving party has the initial burden to show the absence of genuine issues of material fact. *See Schroeder v. Barth*, 969 F.2d 421, 423 (7th Cir.1992). This burden does not entail producing evidence to negate claims on which the opposing party has the burden of proof. *See Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 & n. 3 (7th Cir.1994). The party opposing a summary judgment motion bears an affirmative burden of presenting evidence that a disputed issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Scherer v. Rockwell Int'l Corp.*, 975 F.2d 356, 360 (7th Cir.1992). The opposing party must "go beyond the pleadings" and set forth specific facts to show that a genuine issue exists. *See Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994). This burden cannot be met with conclusory statements or speculation, *see Weihaupt v. American Med. Ass'n*, 874 F.2d 419, 428 (7th Cir. 1989), but only with appropriate citations to relevant admissible evidence. *See* Local Rule 56.1; *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923–24 (7th Cir.1994). Evidence sufficient to support every essential element of the claims on which the opposing party bears the burden of proof must be cited. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

█ In considering a summary judgment motion, a court must draw all reasonable inferences "in the light most favorable" to the opposing party. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). If a reasonable factfinder could find for the opposing party, then summary judg-

ment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992). When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Shields Enters.*, 975 F.2d at 1294.

## III. DISCUSSION

### A. MOTIONS RELATING TO COUNT II

Defendants have moved for dismissal of this count for failure to state a claim under either § 2 of the Act or the Equal Protection clause of the Fourteenth Amendment. Plaintiffs have responded to defendants' motion and moved for summary judgment on this count, employing the same arguments for both. Because the motion to dismiss disposes of this count, the summary judgment motion need not be addressed separately.

### 1. Section 2 Violation

█ At issue under this count is whether the system for electing the attorney members of the Commission is a standard, practice, or procedure imposed or applied in a manner which results in denial or abridgement of plaintiffs' opportunity to participate the same as "other members of the electorate ... in the political process and to elect representatives of their choice." *See* 42 U.S.C. § 1973(b). The Voters argue that by only letting attorneys vote for attorney members, the state puts a "very difficult 'literacy' test and a very expensive 'poll' tax" on them. Plfs' Resp. to Intervening Def's Mot. to Dis. Count II of Plfs' Fifth Am.Compl. at 11 n. 6 ("Plfs' Response"). They also argue that a law license is property, and by limiting the opportunity to vote to those who can certify they have a law license, the state unconstitutionally limits the franchise to holders of specific property. Plfs' Response at 10. In addition, the Voters note that those who are allowed to vote for attorney-members of the Commission are "disproportionately white," citing historical bias among law schools against admitting African–Americans.[10] Plfs' Response at 11, n. 6.

---

10. For purposes of the motion to dismiss, this

claim regarding historical bias among law

Before delving into those allegations, a preliminary question to be resolved is whether the challenged system is governed by the provisions of § 2 of the Act. The protection afforded by § 2 extends to all popular elections, and the corresponding nomination process, of *representatives* of the people. A representative has been defined as anyone selected or chosen by popular election from among a field of candidates to fill an office, including judges. *Chisom v. Roemer,* 501 U.S. 380, 385–86, 111 S.Ct. 2354, 2359, 115 L.Ed.2d 348 (1991). At the time it was passed, the Voting Rights Act was intended to cover "every election in which registered electors are permitted to vote." *Id.* at 392, 111 S.Ct. at 2362 (quoting Attorney General Katzenbach's testimony before the House). In other words, if all registered voters are permitted to vote, and a voting standard, practice or procedure causes members of a protected group to have less opportunity than others to participate in the political process, it violates § 2. The key concept is who is permitted to vote.

When determining whether a specific electoral practice falls within the coverage of § 2, the Court must consider the context of the practice. *See Chisom,* 501 U.S. at 399–400, 111 S.Ct. at 2366. In *Chisom,* the Supreme Court wrestled with the issue of whether § 2 extended to cover the popular election of judges. While deciding that it does, the Court noted that it is perfectly acceptable for judges to be appointed, rather than elected. *Id.* at 400–01, 111 S.Ct. at 2367 (Louisiana could have excluded its judiciary from coverage of Voting Rights Act by changing to system of appointing judges). If judges are appointed, § 2 of the Voting Rights Act does not govern the process.[11] *Id.* Once a state has decided that its judges will be elected by popular vote, then those elections are "in-

cluded within the ambit of § 2 as amended." *Id.* at 404, 111 S.Ct. at 2368.

Indiana has decided that at least some of the judges in Lake County will be popularly elected, but others will not be, at least initially.[12] The reasons behind this decision are of no concern for purposes of this analysis, for it is within the state's prerogative to make such choices. *Chisom,* 501 U.S. at 401–02, 111 S.Ct. at 2367; *Kramer v. Union School Dist. No. 15,* 395 U.S. 621, 629, 89 S.Ct. 1886, 1890–91, 23 L.Ed.2d 583 (1969) (states have latitude to determine if certain public offices are filled by appointment or by elections). The non-county division judges are appointed by the governor, a popularly-elected official, which appointment power is aided by a judicial nominating commission. *See* I.C. § 33–5–29.5–39 (vacancies on the Superior Court of Lake County "shall be filled by appointment of the governor from a list of three (3) nominees presented to him by the judicial nominating commission."). The Commission has the limited purpose of selecting the three highest qualified candidates based on detailed criteria outlined in the statute, and submitting to the governor both a list of those nominees and a written evaluation of each candidate's qualifications. I.C. § 33–5–29.5–37. The governor then selects one person from the list for appointment. In essence, by choosing a system whereby these judges are appointed, Indiana has excluded them from coverage under § 2 of the Act.

That exclusion extends to the entire process involved in making the appointment. Given their duty to assist the governor in selecting the best possible candidate for appointment to the bench, members of the Commission are not "representatives" as defined by the Supreme Court. They do not represent a popular electorate in the sense of being accountable to them. Instead, the per-

---

schools will not be considered as no allegation was made to that effect in the complaint. With respect to the Voters' motion for summary judgment on Count II, the claim is unsupported by any citation to relevant evidence.

**11.** Although the Court referred to judicial appointments under Article III of the Constitution, it is clear from its suggestion that Louisiana could have chosen to appoint its judges that this option is not limited to the life-tenured federal

judge context. It is the act of appointing judges, instead of electing them, that takes the process out of § 2 coverage.

**12.** This Court has already noted that this "hybrid" system does not fall clearly into either category of appointed judge, or popularly elected judge. *See Bradley v. Indiana State Elec. Bd.,* 797 F.Supp. 694, 698 (S.D.Ind.1992).

son accountable to the electorate for the appointment of judges is the governor. *See Kramer,* 395 U.S. at 627, n. 7, 89 S.Ct. at 1889, n. 7 (giving example that if school board were appointed by mayor, voters could affect its composition through their votes for mayor). Because selection of the attorney-members of the Commission is not a popular election of representatives as described in *Chisom,* § 2 simply does not apply. *Chisom,* 501 U.S. at 385–86, 111 S.Ct. at 2359. Rather than being representatives who are chosen by popular election, members of the Commission are more akin to political appointees, in that the governor formerly, and now the county executive, will appoint four of them, Lake County attorneys of all races select four of them, and the Chief Justice of the Indiana Supreme Court, or his designee, rounds out the full complement of nine members. Seen in that light, the State's classification of attorneys as the only qualified electors of attorney members of the Commission does not bring their election within the scope of § 2. Instead, part of the executive's power to appoint officers and advisers has been delegated to members of the Lake County bar, which does not convert the process to a popular election. *See* Ind. Const. Art. 5, § 1 (the executive power of the State shall be vested in a Governor); 1944 Op. Atty Gen. No. 81 (the power of appointment is an executive function); *see also City of Evansville v. State,* 118 Ind. 426, 21 N.E. 267 (1889) (same). That delegation does not change the character of the process as one of executive appointments.

In light of the above, the entire judicial appointment process used for selecting non-county division judges in Lake County does not come within the protections afforded by § 2 of the Act. Consequently, to the extent Count II attempts to state a claim for relief under § 2, it has failed and must be dismissed.

### 2. Equal Protection

■ In the voting rights context, the Equal Protection clause requires at least that in popular elections of governing bodies, each vote should enjoy equal weight, and the state may not devise a system that destroys the one-man, one-vote principle. *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381–82, 12 L.Ed.2d 506 (1964). The Voters maintain that the "election" of the attorney members of the Commission, by votes cast only by members of the Indiana bar who reside in Lake County, constitutes a violation of the Equal Protection clause of the Fourteenth Amendment. That clause applies to classifications made by the political branches of government. *Wroblewski v. City of Washburn,* 965 F.2d 452, 458 (7th Cir.1992). "In order to withstand scrutiny under the Equal Protection clause a law must bear only a rational relation to a legitimate state interest," unless fundamental rights or suspect classifications are implicated. *Id.* Not every classification, however, triggers Equal Protection analysis. "The equal protection clause's proscription of differential treatment applies only where individuals are similarly situated." *Id.* at 459 (citing *Eisenstadt v. Baird,* 405 U.S. 438, 446–47, 92 S.Ct. 1029, 1034–35, 31 L.Ed.2d 349 (1972)).

If an Equal Protection analysis is implicated by the challenged classification, and if the rational basis test is the proper Equal Protection standard, then to survive a motion to dismiss, a plaintiff must allege sufficient facts to overcome the presumption of constitutionality that cloaks the government classification. *Id.* at 460; *see also FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1995) ("[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.").

The Commission and Judges maintain that the classification between lawyers of all races and the general public does not involve a suspect class, nor does it infringe a fundamental Constitutional right, such that the strict scrutiny standard would apply to the Equal Protection analysis.[13] Instead, they argue that the Court should apply the ration-

---

**13.** Strict Scrutiny requires a court to evaluate any classification that infringes fundamental rights, or is suspect, in terms of whether it furthers a compelling state interest, and whether it is narrowly tailored to further that interest. *See Donatelli v. Mitchell,* 2 F.3d 508, 513 (3rd Cir. 1993).

al basis standard. In response to the Voters' claim that voting is a fundamental right, thus triggering strict scrutiny, the Intervenors argue that the "election" at issue does not fall within the fundamental right category. As a general rule, whenever a state "decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election...." *Hadley v. Junior College Dist.,* 397 U.S. 50, 56, 90 S.Ct. 791, 795, 25 L.Ed.2d 45 (1969). According to the Intervenors, two key differences operate to take the Commission out of the general rule.

First, the state may choose how offices are filled, and the State of Indiana decided not to select members of the Commission by popular election. A popular election is one in which all registered voters meeting the age and residency requirements may vote. As noted in the § 2 discussion, only attorneys may vote for the attorney members of the Commission, and the remaining members are appointed by the executive. Attorneys do not constitute a suspect class, and the process of selecting Commission members does not qualify as a popular election. Both selection methods appear to fall more in the category of executive appointments, which does not implicate the Equal Protection clause.

Second, even if the election could be construed as popular, the Commission does not perform traditional governmental functions. When a special unit of government is assigned certain narrow functions, affecting a definable group of constituents more than other constituents, limiting the franchise to members of that definable group is proper. *See Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.,* 410 U.S. 719, 728, 93 S.Ct. 1224, 1229–30, 35 L.Ed.2d 659 (1973) (creating an exception to the one-man, one-vote rule enunciated in *Reynolds,* 377 U.S. at 562, 84 S.Ct. at 1381–82); *Avery v. Midland County,* 390 U.S. 474, 485–86, 88 S.Ct. 1114, 1120–21, 20 L.Ed.2d 45 (1969) (variations may constitutionally exist among local units of government so long as units with "general governmental powers over an entire geographic area" are elected according to the one-man, one-vote rule). Only when the elective body's purpose is narrow and limited, and a special relationship exists between its functions and one class of citizens can there be an exception to the "one-man, one-vote" rule. *Ball v. James,* 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981).

This Court agrees with the Intervenors that Commission members are not selected by popular election and about the nature of the Commission. The Commission is responsible for selecting from among eligible applicants for a judicial appointment the three most highly qualified candidates. This is a narrow and limited purpose and function. In fact, the attorney members of the Commission are elected to a special group that serves no traditional governmental functions at all.[14] The Commission's sole purpose and reason for existence is to screen candidates as part of the judicial appointment process.[15] Consequently, the Commission satisfies the "special unit with narrow functions" prong of the exception to the one-man, one-vote rule.[16]

---

**14.** Traditional governmental functions include the imposition of sales or property taxes, enactment of laws governing the conduct of citizens, selling tax-exempt bonds, condemning property, setting policies that substantially affect all residents, or administering normal functions of government such as maintenance of streets, the operation of schools, or sanitation, health or welfare services. *Ball v. James,* 451 U.S. 355, 366, 101 S.Ct. 1811, 1818, 68 L.Ed.2d 150 (1981).

**15.** A prior version of Indiana law also assigned to the Commission the task of serving as the commission on judicial qualifications, whose functions were set out in provisions that authorized the Commission to recommend retirement or removal of judges on certain grounds. *See*

Ind.Code §§ 33–5–29.5–28, 29.5–44 to 58. Those provisions were repealed by P.L. 18–1995, SEC. 114, effective July 1, 1995.

**16.** The Voters have filed a motion objecting to the right of the Commission to intervene if the Court finds that the Commission is a special unit of government with narrow, statutory functions. *See* Plfs' Alternative Mot. To Reconsider Intervention and/or Supp.Mem. in Oppos. to Mot. to Intervene by the LCJNC and The Judges at 2. They argue that the Commission was not authorized by statute to sue, be sued, or to intervene in litigation. *Id.* The Voters' argument fails for two reasons. First, it does not establish the connection between the alleged absence of authorization to sue or be sued with the permissive

*See Ball,* 451 U.S. at 361–62, 101 S.Ct. at 1816–17 (holding that water district providing more diverse services affecting many more people than the district in *Salyer* still does not exercise the type of governmental functions that trigger *Reynolds* strict scrutiny).

With respect to the second prong, a special relationship can easily be discerned between members of the Lake County bar and the Commission's function of selecting the most highly qualified candidates for judicial appointments. Eligible candidates must be members of the bar, and to be considered one of the three most highly qualified candidates, a person must have distinguished her or himself in connection with legal activities. *See* Ind.Code § 33–5–29.5–36(b). The attorney-members of the Commission are selected to represent the interests and reflect the expertise of the local bar when evaluating candidates for a judicial appointment. Their divergent interests uniquely qualify attorneys to advise the governor, for their interests are different in nature and in scope from the interests of the general public in a fair and impartial judiciary.

Attorneys, as officers of the court and as potential candidates for judicial office, are disproportionately affected by the screening process performed by the Commission. *See Ball,* 451 U.S. at 371, 101 S.Ct. at 1821 (noting that selected group of voters for a special public entity need not be the only parties affected by its operation, rather court looks at whether the effect on the special group is disproportionately greater than the effect on those seeking to vote). Additionally, because the Commission is required to screen the candidates with respect to their contributions to scholarly journals, their legislative drafting or drafting of legal briefs, their public service, their efforts to improve the administration of justice, their probable judicial temperament, and other conduct relating to professional and legal experience, attorneys are in the best position to assist with that process. Because of their divergent interests and unique expertise, attorneys in Lake County can be considered to have a special relationship to the narrow function of the Commission, satisfying prong two of the exception.

In an effort to portray the elections in question as popular elections, thus triggering strict scrutiny, the Voters maintain that non-attorneys are just as interested in the composition of the judiciary as attorneys. They argue that "to only let lawyers vote for the judicial branch" is not reasonable or rational. Plf's Response at 9. The Voters overstate the effect of the Lake County attorneys' votes. To say that they, alone, are "voting" for the judicial branch, is erroneous. First, there is an equal number of attorneys and non-attorneys on the Commission. Second, neither type of Commission member "votes" for the judiciary. Instead, they perform a specific, carefully circumscribed, task on behalf of the governor. Third, the governor appoints a judge from the list of three nominees, and the voting as to whether to retain that choice is done by all Lake County registered voters. Plaintiffs' argument on this point is without merit.

Having found that the election of attorney members to the Commission does not involve a suspect class or infringe a fundamental right, the Court now turns to applying the proper test of the constitutionality of the classification, which is the rational basis test.[17] The State's decision to allow Lake

---

intervention granted here. Second, the arguments raised by this alternative motion should have been made in the Voters' initial opposition to the petition to intervene, and no reason has been offered to explain why this argument is worthy of the Court taking a second look at its earlier ruling. *See In re August, 1993 Regular Grand Jury,* 854 F.Supp. 1403, 1408 (S.D.Ind. 1994) (it is inappropriate to use motion to reconsider to proffer new legal theory or new evidence to support a prior argument when the legal theory or evidence could have, with due diligence, been discovered and offered in earlier consideration of the issue). To the extent that the Voters'

brief attempts to raise the issue of the constitutionality of the make-up of the Commission in light of separation of powers doctrine, it is misdirected. The complaint in this action does not raise any issues about separation of powers under the Indiana or the federal Constitutions. The motion to reconsider is denied in its entirety.

**17.** The plaintiffs argued extensively against application of the "rational basis" test to the classification between attorneys and non-attorneys for purposes of selecting the attorney members. Citing numerous cases in which the Supreme Court has stated that the right to vote is fundamental,

County attorneys the opportunity to select four of their number to serve on the Commission bears a rational relationship to a legitimate state interest. The State of Indiana has a strong interest in obtaining the best qualified members of the local bar to serve on the Commission and to assist with its assessment and screening function. To further that interest, the state has decided to let members of the Lake County bar select those attorney members. Because of their familiarity with the integrity, skill and experience of their fellow members of the bar, the Lake County lawyers appear to be uniquely well-suited to select the best qualified attorney Commission members. The state is free to choose whatever method it deems appropriate for selecting members of the Commission, and the method it has chosen is rationally related to achieving the State's goals. Consequently, it does not violate the Constitution.

Moreover, the Voters' Equal Protection claim is further weakened by the fact that their efforts are directed at obtaining the right to elect less than one-half the members of the Commission. An equal number of non-attorney members of the Commission are selected by a popularly-elected official to represent the interests of the general populace in the type of candidates recommended to the governor. Further, the recent changes in the law have increased the responsiveness to Lake County voters of the officials with power to appoint non-attorney members to the Commission. Instead of those Judicial Nominating Commission members being selected by the governor, as under the old law, they are now selected by members of the Lake County Board of Commissioners. To better reflect the ethnic composition of the county, three of the four non-attorney appointees to the Commission must be residents of each of the three county commissioner districts; one of the four must be a minority individual, and two must be women. Consequently, the non-attorney voters retain the ability to affect the makeup of the Commission, and ultimately the judiciary, by their vote for governor, and their vote for county commissioners, under the new law.

This Court finds that the State's classification represents a reasonable effort to provide representation of both the general populace and the members of the bar on a Commission whose limited function is to advise the governor on the selection of an appropriate candidate for judicial office. Attorneys of all races have an equal opportunity to vote for fellow attorney members, and non-attorney residents of all races are equally prevented from electing attorney-members of the Commission. Thus, there is no Equal Protection violation.

If there had been a violation, the Voters sought the Court's assistance with devising and implementing procedures that would provide minorities with an equal opportunity to elect judges of their choice, if the legislature did not act to remedy the situation. Once it declared the system in violation of the Constitution, the Court would have ordered the legislature to propose a remedy. Because the legislature has acted in a way that may remedy the situation, this Court does not need to act. The Voters have argued that the substance of what they sought with respect to this count has been achieved through the legislative amendment of the statute.[18] They complained that no blacks had ever been elected to the Commission, in part because only ten percent of the attorneys residing in Lake County are black. With the limitations placed by the new law on the Lake County attorneys' right to elect four of their number to the Commission, the likelihood that no blacks will serve on Commission has been greatly reduced.

Count II alleged that the practice of allowing only attorneys to elect attorney members

---

the plaintiffs assert that deprivation of the right to vote in this instance should be subjected to strict scrutiny. The problem with plaintiffs' position is that it ignores the context in which the right to vote is considered fundamental—that is, elections of general interest. Because the Court finds that the election in question is not one of general interest, but is instead an election to a special unit with a narrow and limited purpose,

it does not implicate a fundamental right and therefore is not subject to strict scrutiny.

18. For purposes of seeking attorneys fees pursuant to § 1988, the plaintiffs admitted that the new law provided all of the relief they sought through this action. *See* Plf's Omnibus Brf. at 4.

to the Commission contributed to the Constitutional violations alleged in Count I. Assuming, without finding, that this allegation is true, given the restrictions now imposed on the attorneys' freedom to elect members to the Commission, that claim may be rendered moot by the new legislation. *See Miller v. Benson*, 68 F.3d 163, 164 (7th Cir.1995) ("Victory in the legislative forum makes judicial proceedings moot.") (citing *United Building and Const. Trades Counc. v. Mayor & Council of Camden* 465 U.S. 208, 213–14, 104 S.Ct. 1020, 1024–25, 79 L.Ed.2d 249 (1984)); *Princeton Univ. v. Schmid*, 455 U.S. 100, 102 S.Ct. 867, 70 L.Ed.2d 855 (1982)). Because the new law took effect a little over six months ago, it is too soon to tell what its effect will be. At the least, the law has eliminated the need for the Court to order a remedy to any alleged Fourteenth Amendment violation by the old system.

### B. MOTIONS FOR SUMMARY JUDGMENT ON COUNT I

#### 1. Material Facts [19]

The facts necessary to resolve the claims made under Counts I and III are largely undisputed. Instead the parties dispute the inferences and conclusions to be drawn from these facts. Both sides rely on the same electoral data, but apply different statistical analyses to and interpretations of the data. For purposes of the motions for summary judgment, the Court finds the following facts to be undisputed.

19. For the sake of efficiency, these material facts relate to all motions for summary judgment, even though they are contained in the sub-section discussing Count I.

20. The statute commands the Commission to evaluate each candidate in writing according to the following factors:
 (1) Law school record, including academic honors and achievements;
 (2) Contribution to scholarly journals and publications, legislative drafting, and legal briefs;
 (3) Activities in public service, including:
 (i) writings and speeches . . . ;
 (ii) government service;
 (iii) efforts and achievements in improving the administration of justice
 (iv) other conduct relating to the individual's profession.

The Lake County Superior Court was created in 1973, and it has county-wide jurisdiction vested in four divisions. Ind.Code § 33–5–29.5–1 through 29.5–27. Originally there were three divisions, the civil, criminal and juvenile divisions, but in 1988 the Indiana General Assembly converted the Lake County Court into the county division of the Lake Superior Court. 1988 Ind.Acts P.L. 176 § 10. Initially, the Superior Court consisted of five civil division judges, four criminal division judges, and one juvenile judge. Ind. Code § 33–5–29.5–21. The first judges on the bench included nine white judges and one black judge (Judge Kimbrough). Of those ten judges, three who sat in the criminal division were among the first to be selected by the new appointment system. Judge Kimbrough was one of those three.

The appointment and retention system of selecting the judges in the civil, criminal, and juvenile divisions also began in 1973. *See* Ind.Code. 33–5–29.5–28 through 29.5–42. As part of that process, the Commission submits to the governor "only the names of the three (3) most highly qualified candidates from among all those eligible individuals considered." Ind.Code § 33–5–29.5–36(a). "To be eligible for nomination as a judge of the superior court of Lake County, a person must be domiciled in the county of Lake, a citizen of the United States and admitted to the practice of law in the courts of this state." *Id.* The Commission is guided in its selection of the three most highly qualified applicants by the factors outlined in Ind. Code § 33–5–29.5–36(b).[20] The final decision

(4) Legal experience, including number of years of practicing law, the kind of practice involved, and reputation as a trial lawyer or judge;
(5) Probable judicial temperament;
(6) Physical condition, including age, stamina, and possible habitual intemperance;
(7) Personality traits, including the exercise of sound judgment, ability to compromise and conciliate, patience, decisiveness and dedication;
(8) Membership on boards of directors, financial interest, and any other consideration which might create conflict of interest with judicial office;

about whom to appoint as a judge is made by the governor who selects one of the three candidates recommended by the Commission.

After appointment, a judge serves either a prescribed initial term, or completes the unexpired term of the judge he or she is replacing. To serve beyond this initial term a judge must submit to a county-wide, at-large retention vote. Ind.Code § 33–5–29.5–42. If rejected by the electorate the judge is replaced by operation of the entire appointment process.[21] *Id.* If not, the judge will serve a subsequent six-year term, standing for retention again at the end of that term. Ind.Code § 33–5–29.5–41.

From 1973 to 1993, which is the period for which the parties have provided data, twelve judges have been appointed to the civil, criminal, or juvenile divisions of the Lake Superior Court. Of those twelve appointees, only one was African–American, and eleven were white. Ans. to Plfs' Interrog. to the Judicial Nominating Comm. for the Sup.Ct. of Lake Cty., pp. 4–6, 7–9. Judge Kimbrough, who was African–American, was a minority-preferred candidate, and was retained each time he stood for election. He served from 1974 until he died in 1987. *Id.*

The total number of nominees recommended to the governor during the relevant period consisted of six African–Americans and thirty-one whites, which reflects a 16% to 84% ratio of blacks to whites. *Id.* Although records are not available for every appointment process, the ones that are available reveal that a total of twenty-three black attorneys applied for a judicial appointment, while one hundred white attorneys did so. Of that total of 123 applicants, 18% were black and 82% white. *Id.*

In 1988, the county division was created. The three judges in that division were to be selected by county-wide, at-large popular elections for six-year terms. Ind.Code § 33–5–29.5–42.5. Prior to the conversion from the County Court to the county division, there were three white judges on the County Court bench. One of those judges, Judge Krajewski, was appointed by the governor from a list of two nominees to serve as a judge in the county division. The other nominee for the position, Bernard Carter, is black. Ans. to Plfs' Interrog., p. 9. In November, 1990, Democrat Carter challenged Republican Judge Krajewski for a seat on the county division bench, and defeated him with a total of 57,993 to 33,564 votes. Certified Records of 1990 Election Returns in Lake County, Ind. Judge Carter was a preferred candidate of black voters in Lake County. Intervening Def's First Req. for Adm., Request 2.

This action was filed on August 9, 1991, after which Judge Stanko, who is white, resigned from the county division bench. He was replaced by Sheila Moss, who is black. Judge Moss is a preferred candidate of black voters in Lake County. *Id.* In 1992, Judge Mears, who is white, lost a retention election for the juvenile division. Certified Records of 1992 Election Returns in Lake County, Ind. By 1993, two of the thirteen Superior Court judges were black, both of whom were in the county division. At the end of 1993, Judge Carter resigned to become the Lake County Prosecutor.

Between 1976 and 1992, four judicial elections involved African–American candidates: Judge Kimbrough in 1976 and again in 1982; Judge Carter's 1990 primary election; and Judge Carter's 1990 general election. In 1976, Judge Kimbrough was retained with 40,031 yes votes to 21,021 no votes. Certified Records of 1976 General Election Returns. He won with 56% of the vote in every one of the twenty-two cities, towns, and townships then in Lake County. *Id.* According to 1970 census figures, of those twenty-two areas, eighteen contained less than 5% African–Americans of voting age. Desig.

(9) Any other pertinent information the commission feels is important in selecting the best qualified individuals for judicial office.

\* \* \* \* \* \*

(e) In determining which eligible candidates shall be recommended to the governor, the commission shall consider that racial and gen-

der diversity enhances the quality of the judiciary.

**21.** Two Lake County Superior Court judges have been rejected by retention vote during the relevant period. In 1978, Judge Giorgi was not retained, and in 1992 Judge Mears was not retained.

and Subm. of Docs. in Sup. of Intervening Defs' Mot. for Sum.J., Exh. 12. Judge Kimbrough received over 50% of the vote in each of these eighteen, predominantly white areas.

In 1982, Judge Kimbrough's retention election success featured 34,672 yes votes to 17,811 no's. Those voting to retain him constituted 60% or more of those who voted in twenty-one of the twenty-four cities, towns, and townships in Lake County. *Id.*, Exh. 10. Judge Kimbrough won a majority of white votes in the nineteen areas in which blacks comprise less than 1% of the voting age population as of the 1980 census. In addition, Judge Kimbrough received a similar proportion of yes votes as did his white colleagues running for retention in 1982. *Id.*

In 1990, Judge Carter ran unopposed in the May Democratic primary, and received a similar number of votes as did the other two Democratic candidates for judicial office (Carter—34,383 votes; Stanko—32,364 votes; Schiralli—36,206 votes). *Id.*, Exh. 5. In November, 1990, Judge Carter ran against an incumbent, who was a white Republican, for a seat on the county division bench. The total vote in the election was 91,557, of which Judge Carter received 57,993, or 63% of the vote, to 33,564, or 37% for former Judge Krajewski. *Id.*, Exh. 4; Certified Returns of 1990 General Election in Lake County, Ind. Judge Carter's vote totals were within 6,000 votes of the amounts received by Judges Stanko and Schiralli, who ran unopposed. *Id.* According to the 1990 census, 22.5% of the total voting age population in Lake County is black. If 91,557 votes were cast in the Carter–Krajewski contest, and 22.5% (20,600) of those are assumed to be by black voters and for Carter, that leaves 70,957 white votes in the election (91,557–20,600), of which 37,-393 votes were cast for Carter (57,993–20,-600). That figure represents 53%, or a majority, of the total white vote that was cast for Judge Carter (37,393/70,957).

In retention elections involving only white incumbents, voters voted to retain all judges except Judge Giorgi in 1978 and Judge Mears in 1992. *See* Desig. and Subm. of Docs. in Sup. of Int.Defs' Mot. for Sum.J.,

Ex's 2–4, 7–11. The proportion of yes to no votes was virtually identical for areas with predominantly white residents and those with predominantly black residents. *Id.*

Likewise, in recent statewide popular elections in which a white candidate ran against an African–American candidate, the African–American candidates won. *See* Certified 1990 General Election Returns, Feb. 22, 1994 Submission, Exh 1; Henderson Aff., Tables 7, 9. In November, 1990, an African–American candidate, Dwayne Brown, won election to the post of Clerk of the Indiana Supreme Court. *Id.* Brown received a majority of white votes in Lake County.[22] Henderson Aff., Table 7. In November, 1992, Pam Carter, an African–American candidate, won election to the office of Indiana Attorney General. She received a majority of white votes in Lake County. *Id.*, Table 9.

In three Democratic primary elections in which an African–American candidate ran against a white candidate, the results varied according to the race of the candidate. In May, 1990, the Democratic primary for Congressional District 1 included four contenders: Hall (African–American), Reising (white), Smith (white) and Visclosky (white). Hall received 67.67% of the black vote and 6.43% of the white vote. Visclosky received 19.35% of the black vote and 70.70% of the white vote. Henderson Aff., Tables 7, 9. The winner was Visclosky. *See* Feb. 22, 1994 Subm. by Intervenors, Ex. 1, Certified 1990 General Election Results. The African–American candidate in the May, 1992, primary for State Representative from District 3 was Brown. He received 68.55% of the black vote and 20.73% of the white vote. Fisher, who is white, received 21.61% of the black vote, and 2% of the white vote. Mays, who is white, received 9.84% of the black vote, and 77.26% of the white vote. Henderson Aff., Table 12. The winner of this election cannot be discerned from the data provided. Finally, in the May, 1992, primary race for county coroner, Williams, an African–American candidate, received 72.18% of the black vote, and 10.76% of the white vote. Philpot, a white candidate, re-

---

**22.** For purposes of clarity, the Court will recite the bivariate regression statistical data from the tables accompanying the Voters' expert's affidavit.

ceived 8.19% of the black vote and 55.85% of the white vote. *Id.,* Table 13. Philpot won. Henderson Dep., p. 163. In all other non-judicial elections for which data was analyzed, the African–American candidate received the majority of both the black and the white votes. *Id.*

### 2. Section 2 Claims

■ In Count I, the Voters allege that the retention election system used in Lake County denies blacks the right to elect judges of their choice and denies black attorneys the right to challenge incumbent white judges. Complt. ¶ 11. Because of the "long history of official discrimination" in Indiana and Lake County, and the fact that voting in Lake County is "racially polarized," the retention system closes the political process for electing judges to blacks. Complt. ¶¶ 13, 14. Plaintiffs also allege that because the retention elections are county-wide, at-large elections, they "dilute" the votes of the politically cohesive black voters. Complt. ¶ 17. As noted in the Court's earlier ruling, to avoid summary judgment, plaintiffs must be able to "flesh out" these allegations.

The Voters' claims under this count are brought pursuant to § 2 of the Act, which provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of the circumstances, it is shown that the political processes leading to the nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

42 U.S.C. § 1973.

In 1982, Congress amended the Act to expand the scope of § 2 to include a prohibition of any standard, practice, or procedure that *results* in a denial or abridgement of the right to vote. The prior law had prohibited any act that *denied* or abridged the right to vote, and had been interpreted by the Supreme Court as requiring proof of intentional discrimination. *Chisom,* 501 U.S. at 393, 111 S.Ct. at 2363 (citing *Mobile v. Bolden,* 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1495–96, 64 L.Ed.2d 47 (1980)). To broaden the scope of § 2 Congress drafted language that focused on the effect or result of a given practice. The "results" test requires an inquiry into the "totality of the circumstances" surrounding a challenged electoral practice. 42 U.S.C. § 1973(b). The inability to elect a representative of their choice does not suffice to establish a § 2 violation unless, in light of all the circumstances, it appears that the members of the protected class have less opportunity than others to participate in the electoral process. *Chisom,* 501 U.S. at 397–98, 111 S.Ct. at 2365.

The essence of a claim under § 2 of the Act is that a certain electoral law, or practice or procedure, "interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2764–65, 92 L.Ed.2d 25 (1986). By an earlier ruling this Court denied a motion to dismiss brought on the basis that § 2 does not apply to the civil, criminal, and juvenile judges of Lake County because they are appointed, rather than elected. The Court held that in hybrid systems, such as the one at issue here, even though judges are initially appointed, because they must submit to retention elections they can be considered representatives and § 2 would apply. The Court limited its ruling, however, to make clear that consideration of a § 2 violation only extended to the retention elections of these judges, and to the popular election of the judges in the county division. *See Bradley v. Indiana State Elec. Bd.,* 797 F.Supp. 694, 698 (S.D.Ind.1992) (stating that the Act applies to the county's retention elections, "but this does not mean that it also governs the nomination and appointment procedures

which first put judges onto the Superior Court.").

Successful prosecution of a § 2 vote dilution claim requires that plaintiffs meet the three necessary preconditions established by the Supreme Court in *Gingles. See Johnson v. DeGrandy,* — U.S. ——, ——, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775 (1994); *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67; *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 942 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989), (holding that *Gingles* necessary preconditions must be met before a § 2 plaintiff can cross the summary judgment threshold). First, a minority group must show that it is sufficiently large and geographically compact to constitute a majority in a single-member district; second, the group must show that it is politically cohesive; and third, the group must show that white bloc voting (racially polarized voting) usually thwarts the successful election of a minority-preferred candidate. *McNeil,* 851 F.2d at 942. Although meeting the preconditions is necessary to prove a § 2 claim, *it is not sufficient to establish a violation. Johnson,* — U.S. at ——, 114 S.Ct. at 2657. Once those preconditions are met, the group must then seek the court's determination that, based on the totality of the circumstances, the challenged devices, practices, standards, or procedures, result in unequal access to the electoral process. *Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 362 (7th Cir.1992), *cert. denied,* 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993), (citing *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764).

A careful reading of the Fifth Amended Complaint discloses that part of the Voters' concerns regarding the retention elections originate, at least indirectly, from the process by which judges are appointed in the first place. In Count I, they allege that the "manner" of electing judges for the civil, criminal, and juvenile divisions is a standard, practice, or procedure that results in denial or abridgement of the Voters' rights that are protected by § 2 and the Fourteenth and Fifteenth Amendments. Complt. ¶ 18. They also specifically allege that the system of conducting retention elections for these judges causes black voters to be unable to elect judges of their choice. Complt. ¶ 19. Coupled with the challenge in Count II of the election procedure for attorney members of the Commission, which the Voters claim contributed to the violations in Count I, these allegations in Count I reveal an intent to achieve greater minority influence on the initial appointment process. That conclusion is supported by the general entreaty in the Prayer that if the Indiana General Assembly does not take action to remedy the situation, the Voters want this Court to devise and implement procedures "for electing Lake County Superior Court judges which provide black citizens in Lake County with an equal opportunity to elect judges of their own choice." Complt.Prayer. If the nomination and appointment process are being separately attacked in Count I, the Court reiterates its former finding that § 2 does not apply to those aspects of the retention election process.

To the extent that the nomination and appointment process are integrated with the alleged violation of § 2 during the retention elections, the Court will address certain circumstances surrounding that process. The statute governing the composition of the Commission has changed since the time when the Fifth Amended Complaint was first filed. In addressing the merits of the Voters' claims, the Court is obliged to refer to the statute as it currently is, not as it was. *See Diffenderfer v. Central Baptist Church,* 404 U.S. 412, 414, 92 S.Ct. 574, 575–76, 30 L.Ed.2d 567 (1972); *Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201–02, 24 L.Ed.2d 214 (1969). That change appears to address some of the Voters' concerns about the judicial nomination process in Lake County, which process may indirectly affect the allegations relating to the retention elections. Assuming, without finding, that the Voters can meet the *Gingles* factors, to determine whether a practice or procedure violates § 2 the Court must focus on the totality of the circumstances, and assess whether members of the protected group have less opportunity than others to participate in the electoral process. At this point in this litigation, the Court must consider the changed circum-

stances in which the Commission and the appointment process find themselves.

Although the new law does not totally render this count moot, it does change things. Just how things have changed—it is too early to tell. Section 2 requires courts to analyze the result or effect of the challenged electoral standard, practice, or procedure, to see if it is imposed in a manner that causes a denial or abridgement of the right to vote on account of race or color. *See Baird,* 976 F.2d at 359 (noting that Congress defined violations of § 2 in terms of outcome, not intent, although the goal is equality of opportunity, not equality of outcome). Successfully proving an intent to deny or abridge the voting rights of a protected group would also suffice.

Since the new law just became effective a little more than six months ago, it is too early for this Court to make a finding regarding its result or effect. Likewise, it is not clear whether any retention elections have been held under the new law, nor is the Court aware of any appointments that have been made thereunder.

The absence of any feedback as to the impact on Lake County judicial retention elections of the intervening changes in the law prevents the Court from rendering an opinion with respect to whether the judicial retention election system in Lake County violates § 2 of the Act. "The adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed, which make resolution of the controverted issue a practical necessity." *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961); *Conway Sch. Dist. v. Wilhoit,* 854 F.Supp. 1430, 1441 (E.D.Ark. 1994) (finding a Voting Rights case not ripe).

The issues here may appear to raise a "ripeness" concern, but the problem is more correctly described as a failure of proof. Since ripeness is determined as of the date of filing the action, a subsequent change in the law cannot defeat the Court's jurisdiction on ripeness grounds. While it is tempting to view the situation as analogous to a lack of ripeness, it is better characterized as a failure of proof. The failure is caused by the absence of any data about the effects of the new system for selecting members of the Commission, or about a newly-composed Commission's recommendations for gubernatorial appointments. This lack of proof hinders the Court in a way that is similar to a lack of ripeness of any Constitutional or § 2 claims under the new law.

Moreover, the fact that the law has changed, and on its face the change appears to increase the influence minorities have on the judicial selection process in Lake County, makes it unnecessary to render any opinion with respect to the former system. *See Diffenderfer,* 404 U.S. at 414, 92 S.Ct. at 575–76; *Hall,* 396 U.S. at 48, 90 S.Ct. at 201–02. In an effort to be designated prevailing parties, the Voters asked the Court to find that they had achieved the substance of what they had sought. Plfs' Prevailing Party Brf. at 7 (citing *Hastert v. Illinois St. Bd. of Elec. Comm.,* 28 F.3d 1430, 1440 (7th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 426, 130 L.Ed.2d 340 (1994)). Subsequently, the Voters withdrew that motion from consideration and instead asked the Court to resolve the prior dispositive motions. With respect to Count I of this Complaint, the Court finds it unnecessary to render a declaratory judgment relating to an electoral practice that has changed, just as it is unnecessary to design and implement a procedure to remedy the situation. The situation may have been remedied. Judging only from the Voters' effort to be declared a prevailing party, the situation was remedied. However, to the extent that the Voters are asking for a decision that the new law renders Count I moot, the Court declines the invitation.

Count I is directed at a retention election affected by an underlying appointment process that has changed, and to that extent it would seem to be moot. However, because the new law has yet to be applied, and because a violation of § 2 is such a fact-sensitive inquiry that frequently depends on consideration of statistics and other data relating to elections held pursuant to the challenged practice, standard, or procedure, the Court finds it premature to determine whether the current system violates § 2. *See e.g. Gingles,* 478 U.S. at 66, 106 S.Ct.

at 2774 (courts should take a functional view of the political process and "conduct a searching and practical evaluation of reality."); *Southern Christian Leadership Conf. v. Sessions,* 56 F.3d 1281, 1293 (11th Cir. 1995) ("*SCLC*"), *cert. denied,* —— U.S. ——, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996), (noting that the district court "engaged in a searching and meaningful evaluation of *all* the relevant evidence concerning the challenged trial court jurisdictions."); *Lucas v. Townsend,* 967 F.2d 549, 551–552 (11th Cir. 1992), *reh'g denied,* 979 F.2d 1540.

To the extent that Count I also challenged a system whereby judges in the civil, criminal and juvenile division stand for retention in county-wide, at-large elections, the Court finds that the new law affects the evidence needed to prove dilution. Courts must be sensitive to the unique circumstances involved with retention elections, which by definition have only one candidate, who is an incumbent, and a limitation on the vote to "yes" or "no." Thus, the fairness of the appointment process is a substantial factor to consider when assessing the level of participation enjoyed by voters in the electoral process. In the absence of data from any retention elections held after the new law has had an effect on the composition of the Commission and the incumbent judges, the Court is hard-pressed to make a determination with respect to the prerequisites of *Gingles,* much less the totality of the circumstances analysis. The § 2 claim in Count I fails for all of these reasons.

### 3. Constitutional Claims

 The Voters also assert claims under the Equal Protection clause of the Fourteenth Amendment, which prohibits any state from making or enforcing "any law which shall abridge the privileges or immunities of citizens of the United States." A state is also prohibited from denying "any person within its jurisdiction the equal protection of the laws." **U.S. Const.** amend. XIV, § 1. The Fifteenth Amendment, under which plaintiffs also pursue a remedy, states that "the right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." **U.S. Const.** amend. XV, § 1. The Fifteenth Amendment grants Congress the power to enforce its protections by "appropriate legislation." *Id.* § 2. The Voting Rights Act of 1965, as amended, constitutes that legislation. *See Chisom,* 501 U.S. at 381–82, 111 S.Ct. at 2357 (central purpose of the Voting Rights Act is to enforce the Fifteenth Amendment); *United States v. Arizona,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); *State of South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966).

The Constitutional claims raised by the plaintiffs may be enforced through § 1983, which establishes a remedy for any person who has been deprived of his or her "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Liability attaches to those who have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State" in a way that deprives another of Constitutional protections. *Id.* To establish liability under the Equal Protection clause or the Fifteenth Amendment, a party must prove intentional discrimination on the part of the State. *See Chisom,* 501 U.S. at 403, 111 S.Ct. at 2368 (noting that Congress amended the Voting Rights Act in 1982 "to relieve plaintiffs of the burden of proving discriminatory intent" like they must under the Constitutional claims); *Gingles,* 478 U.S. at 35, 106 S.Ct. at 2758 (noting that § 2 of the Act does not require plaintiffs to prove that a "contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose" as is necessary for proving Fourteenth or Fifteenth Amendment claims); *Barnett v. Daley,* 32 F.3d 1196, 1198 (7th Cir.1994). They must prove first a discriminatory effect of existing laws, such as vote dilution, and second, that the effect is caused by a discriminatory purpose chargeable to the state. *Lucas,* 967 F.2d at 551.

Because of the change in the law establishing the system by which judges are appointed, the Court need not address whether the prior retention system violated the Fourteenth or Fifteenth Amendments. On its

face, the new statute reflects anything but evidence of an intent to discriminate against minorities. Rather, it seems aimed at increasing the opportunity for minority involvement in the political process. As discussed above, the new law affects the issues surrounding whether minority voters are able to choose their preferred judges, which minimizes the effect of any data from prior retention elections. The effect of the new statutory scheme, however, cannot be shown at this time. Consequently, the Voters' Constitutional claims relating to the appointment and retention process must suffer the same fate as the § 2 claims and be dismissed.

### C. MOTIONS FOR SUMMARY JUDGMENT ON COUNT III

#### 1. Section 2 Claims

In Count III plaintiffs allege that the method of electing judges to the county division of the Lake County Superior Court—by county-wide, at-large elections—results in a dilution of their "politically cohesive votes" due to racial polarization. This issue seemingly is not affected by an increase in minority representation on the Commission under the new law. It is connected, however, to plaintiffs' general complaint that they have been unable to participate in the political process to the same extent as whites, and to elect judges of their choice. With a county-wide jurisdiction limited to small claims, the county division judges are the ones who have the most contact with the general populace, especially those members of the populace who have relatively little property and scarce financial resources. *See Superior Const. Co. v. Carr*, 564 N.E.2d 281, 284–85 (Ind.1990) (holding that Lake Superior Court's county division functions the same as, and has the same jurisdiction as, statutorily-described

"county courts").[23] That disproportionate contact with some of the most economically-disadvantaged residents of Lake County places county division judges in a position requiring considerable empathy for and understanding of the conditions in which those residents find themselves. These circumstances magnify the need for each resident to feel that his or her vote counts, and the need for equal participation among all members of the community in the political process.

The cases handled by county division judges often involve disputes concerning the basic necessities of the litigant's life, such as landlord-tenant issues, consumer credit disputes, repossessions, and cases under the "Lemon Laws." In addition, these judges see litigants on a daily basis who are not represented by counsel, are unfamiliar with the legal system, and who have scarce resources with which to obtain assistance. Consequently, the concern of voters that these judges be empathetic and responsive to the unique problems faced by the economically-disadvantaged litigants who appear before them is valid. One of the best ways to promote that sensitivity is to make sure that those who appear before these judges are not disadvantaged in their ability to elect the judges of their choice.

If the plaintiffs can show that racial bias existing in Lake County is interacting with the at-large, county-wide electoral system to dilute their voting strength, then this Court's duty under the Voting Rights Act is clear: to declare the county-wide, at-large system of electing judges to the county division a violation of § 2 and order the legislature to propose a remedy. *See White v. Weiser*, 412 U.S. 783, 794–95, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1973); *Nipper v. Smith*, 39 F.3d 1494, 1527–47 (11th Cir.1994), *cert. de-*

---

**23.** Indiana Code § 33–10.5–3–1 limits the jurisdiction of county courts as follows:

(1) Original and concurrent jurisdiction in all civil cases founded on contract or tort in which the debt or damage claimed does not exceed ten thousand dollars ($10,000).

(2) Original and concurrent jurisdiction in possessory actions between a landlord and tenant and original exclusive jurisdiction in actions for the possession of property where the value of the property sought to be recovered

does not exceed ten thousand dollars ($10,000).

(3) Original and concurrent jurisdiction of all Class D felony, misdemeanor, and infraction cases.

(4) Original and concurrent jurisdiction of cases involving the violation of ordinances of cities, towns, or other municipal corporations.

(5) Original and concurrent jurisdiction of cases involving violations of ordinances which relate to traffic.

*nied,* —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995). How the Voters go about making this showing is governed by the requirements of proof set out in *Gingles,* and refined in subsequent appellate court decisions in the judicial election context.

When vote dilution claims implicate judicial elections, however, courts need to adjust the factors that have been enunciated in non-judicial election cases to this context. *See Chisom,* 501 U.S. at 403, 111 S.Ct. at 2368 (noting that serious problems may attend the straightforward application of the totality of the circumstances factors in § 2 to the judicial election context). Judicial elections are *sui generis, League of United Latin American Citizens Council No. 4434 v. Clements,* 914 F.2d 620, 631 (5th Cir.1990), *rev'd on other grounds,* 501 U.S. 419, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991), and must be treated somewhat differently than non-judicial elections.

A key difference between judicial elections and corresponding elections of other types of representatives is that judges are not elected to be responsive to constituents, nor are they expected to pursue an agenda on behalf of a particular group. *Nipper,* 39 F.3d at 1534–35. They do not make their decisions as part of a collective body, with active debate about the issues, subsequent negotiation, compromise, and then a decision rendered by majority vote. *Id.* Instead judges exercise their power independently. Judges "represent" their constituents by adhering to legal precedent, deliberating carefully over whether such precedent is inapplicable, and by deciding the disputes before them in a fair and unbiased manner.

Thus, the way to assess whether judges are representing all of their constituents is to consider whether they are administering jus-

tice in a fair and impartial way. If the Voters can show that minority litigants who appear before judges in the county division historically have been deprived of both a fair and impartial resolution of their claims and an equal opportunity to elect judges of their choice, then they will have demonstrated a situation that demands a remedy. The goal is equal justice for all, regardless of race, and if the means used for electing judges has the effect of diluting the voting strength of minorities such that they are unable to elect the judges of their choice, and if the judges who are elected render decisions in a racially discriminatory manner, this Court is required to act.[24]

Courts also must consider the importance of the state's interest in maintaining its chosen electoral system and structure of the judiciary when analyzing a challenge to at-large, county-wide judicial elections. *See Houston Lawyers' Ass'n v. Attorney Gen'l of Texas,* 501 U.S. 419, 426–27, 111 S.Ct. 2376, 2380–81, 115 L.Ed.2d 379 (1991) (suggesting the addition of this factor to the totality of the circumstances analysis); *see also Cousin v. McWherter,* 46 F.3d 568, 575 (6th Cir. 1995); *Nipper,* 39 F.3d at 1528–29. The Supreme Court has pronounced that interest legitimate, which obviates the need to address the Voters' challenge to the Intervenors to show the source of the state's interest. With these adjustments in hand, the Court now turns to an assessment of the plaintiffs' vote dilution claims.

For purposes of the motions for summary judgment, the parties do not dispute the first or second *Gingles* preconditions. Nor do they dispute the facts reflected in the Intervenors' evidence regarding Lake County election results. Instead they focus on the third precondition, vehemently contesting

---

24. *Although responsiveness to minority constituents does not ordinarily form an essential part of a vote dilution claim, see* Senate Report at 29, n. 116; *Campos v. City of Baytown,* 840 F.2d 1240, 1250 (5th Cir.1988), in the context of judicial elections it takes on greater weight. Judges must meet significantly higher qualifications to become candidates in the first place, and the differences between them are less apparent. Once elected they are to administer the law as it has been handed down to them, and have only slight influence on public policy. Hence, their sensitiv-

ity to the needs of minority constituents and litigants becomes a crucial means of measuring whether the judge is a minority-preferred candidate. In this vein, the Court proceeds on the assumption that the Voters surely are not simply seeking to elect African–American judges in numbers equal to their proportion in the general population. No such result is guaranteed by § 2. *See* 42 U.S.C. § 1973(b) ("nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.").

whether the Voters have sufficient evidence to show, or raise a genuine issue of material fact to dispute, that the white majority in Lake County votes sufficiently as a bloc so that, absent special circumstances, it usually defeats the minority-preferred candidate. *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766–67. To pass the summary judgment threshold, a plaintiff must be able to demonstrate all three *Gingles* preconditions. *McNeil,* 851 F.2d at 942. If the plaintiffs are unable to meet one of the *Gingles* preconditions, summary judgment is appropriate without further examination of the Senate Factors. *See Bradley,* 797 F.Supp. at 699; *Valladolid v. City of National City,* 976 F.2d 1293, 1297 (9th Cir.1992).

The Intervenors point to the fact that in every instance of a judicial election involving a minority-preferred candidate, not only did a majority of white voters cast ballots for the candidate, but a sufficient number of majority voters crossed-over and helped elect the candidate preferred by the minority. Rather than being usually defeated by white bloc voting, Intervenors argue, every minority-preferred candidate for the Lake County Superior Court has been elected. A total of four judicial elections have occurred in which this phenomenon can be observed. Two of them were retention elections of Judge Kimbrough, in 1976 and again in 1982. In each election Judge Kimbrough was retained. The other two elections involved a candidate for the county division, Bernard Carter, who was popularly elected in a contest against an incumbent white judge in 1990.[25]

The Voters focus on non-judicial elections in order to demonstrate the existence of racial polarization and majority bloc voting that is sufficient to defeat a minority-preferred candidate. In addition, they argue that regardless of the effect of the current electoral system in Lake County, its intent was to discriminate on racial lines. Finally, the Voters assert that evidence of the electoral success of some minority-preferred candidates does not suffice to negate a well-supported vote dilution claim. *See Collins v. City of Norfolk,* 883 F.2d 1232, 1241–42 (4th Cir.

1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990); *Gomez v. City of Watsonville,* 863 F.2d 1407, 1409 n. 1 (9th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989); *Buckanaga v. Sisseton Indep. School Dist. No. 54–5,* 804 F.2d 469, 476 (8th Cir.1986). While this statement is generally true, its applicability to a given case depends on the unique facts of the case.

Because the undisputed success of minority candidates in judicial elections is the cornerstone of the Intervenors' summary judgment arguments, the Court will address the Voters' third argument first. The Court first notes that the cases cited by the Voters were not decided in a judicial election context. Nevertheless, in *Collins,* the evidence revealed that, although an African–American had been on the Norfolk city council since 1968, no second minority-preferred candidate could get elected to the position. In deciding that no vote dilution existed, the trial court had disregarded evidence indicating that in seven out of thirteen of the challenged races, a minority-preferred candidate (*i.e.* a black candidate receiving more than 70% of the black votes cast) was defeated by a white-preferred candidate. *Collins,* 883 F.2d at 1239–40.

The trial court also noted that a second minority-preferred candidate had been elected to the council, although only after the suit was filed. However, according to the appellate court, special circumstances surrounded that election, which made it appear to be an aberration. *See id.* at 1241–42. Those circumstances included the fact that suit had already been filed charging a § 2 violation, the mayor was a defendant in that suit, the mayor had publicly said that the election of a second minority candidate would moot the litigation, the mayor's political group had endorsed only two candidates when three positions were open, and a member of the state's general assembly had characterized the situation as "unique." *Id.* The appellate court reversed the trial court's finding of no racial polarization and remanded the case for consideration of the overlooked evidence.

**25.** Judge Carter has since resigned. Although he was replaced by a white judge, another minority-preferred candidate, Sheila Moss, was appointed as judge to the county division in 1991.

A different factual situation yielded similar results in *Gomez*, where the trial court had found no violation of § 2 based in part on the fact that a hispanic candidate had been elected to the council. The appellate court reversed, stating that the fact that a hispanic candidate was elected to one of three positions during an election in which only two anglo candidates and three hispanics were running not only was inevitable, but it did not invalidate the plaintiffs' vote dilution claim. *Gomez*, 863 F.2d at 1409, n. 1. It found that the trial court had not given sufficient weight to the fact that no hispanic had ever before been successful, that eight hispanic candidates had run for the challenged office between 1971 and 1985, none of whom were elected, and that the plaintiffs' expert had testified that the challenged elections were earmarked by racially polarized voting. *Id.*

Finally, in *Buckanaga*, the trial court had focused exclusively on minority candidate successes, and ignored their failures. *Buckanaga*, 804 F.2d at 476. The appellate court noted "substantial contrary evidence that the Indian community had not been successful in electing persons to public office," and reversed the trial court's findings of fact as clearly erroneous. *Id.* Evidence had also been presented that the one Indian on the school board was hand-picked by the white school board members. The presence of that one minority person on the board did not outweigh evidence that in twenty-three contests involving minority candidates, only three Indians had won a position. *Id.*

The cases cited by the Voters can be distinguished in at least four ways. First, in this case, there is no long history of minority candidates' lack of electoral success. Rather, the opposite has been true. Second, the Voters' allegations that Judge Carter was elected by special circumstances cannot be reconciled with the lack of evidence of such circumstances offered by the Voters. The allegations they have made regarding what the special circumstances were, that he won the primary as part of a political deal, does not compare with what the court found in *Collins*. Judge Carter was elected before the pending action was filed, and no evidence

was offered to show that his election was intended to head-off a § 2 claim. The Voters' bare conclusory assertion that he was elected as part of a political deal, without even explaining the relevance of the "deal," leaves the Court with no evidence of special circumstances.

Third, unlike in *Gomez* where the plaintiffs' expert testified that racially polarized voting had occurred in the challenged elections, the Voters' expert has specifically denied any racial polarization in the judicial elections. *See* Henderson Dep. at 139. Finally, the Voters' contention that Judge Carter was a white-picked candidate is unsupported by any evidence other than the number of whites who voted for him, which does not suffice to raise a genuine issue. Surely the Voters do not mean to suggest that anytime a majority of white voters cast ballots for a minority candidate, that candidate is "white-picked," and therefore cannot be considered a minority-preferred candidate.

In the Voters' first argument in favor of a finding of racial polarization, they point to the relative scarcity of black judges on the Superior Court to justify using the results of exogenous (non-judicial) elections. They argue that the evidence of racial polarization from those elections is legally significant. To be considered legally significant for purposes of the *Gingles* prerequisite analysis, racial polarization, or white bloc voting, must be sufficient to enable it, in the absence of special circumstances, to usually defeat the minority-preferred candidate. *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766–67. According to the Court, generally "a white bloc vote that will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." *Id.* at 56, 106 S.Ct. at 2769. White bloc voting is one manifestation of racial polarization. Without successfully proving the existence of legally significant white bloc voting in the exogenous elections, the Voters proceed on the assumption that they have met the three *Gingles* preconditions, and analyze the "totality of the circum-

stances," using the Senate factors.[26] From that analysis, they conclude that a § 2 violation has been proven, and that they are entitled to judgment as a matter of law.

The problem with the Voters' conclusion is that they have failed to provide sufficient evidence to support a finding that they have met the third *Gingles* prerequisite, much less raised a genuine issue of material fact with respect thereto.[27] Although courts are to use a flexible, fact-sensitive approach to determine whether a particular electoral scheme violates § 2, plaintiffs bear the burden of proving such a violation occurred. In doing so, plaintiffs are limited in three ways:

> First, electoral devices, such as at-large elections, may not be considered per se violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process.... Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation.... Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764. For these reasons, the Supreme Court established the three preconditions that must be met before a plaintiff can prove a violation.

Here, by plaintiffs' own expert's admission, no legally significant racial polarization can be discerned in any of the challenged judicial elections. *See* Henderson Dep. at 74, 84, 95, 139, attached as Exh. A to Intervening Def's Reply Brief in Support of Mot. for Sum.J. on Counts I and III. Those elections are considered the most probative ones for purposes of the Voters' claim. *See Southern Christian Leadership Conf. v. Evans,* 785 F.Supp. 1469, 1473 (M.D.Ala.1992), *aff'd en banc,* 56 F.3d 1281 (11th Cir.1995), *cert. denied,* — U.S. ——, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996). Although the most probative of the judicial elections are those in which a minority candidate opposed a white candidate, the elections with no minority candidates are also relevant. *See Baird,* 976 F.2d at 361.

In each of the judicial elections examined by the Voters' expert, the minority-preferred candidate was elected with a majority of the votes of the white voters, in addition to winning the majority of the black votes.[28] More-

---

**26.** The non-exclusive list of typical factors to be analyzed in a totality of the circumstances assessment include:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction. Additional factors that in

some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particular needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualifications, prerequisite to voting, or standard, practice or procedure is tenuous.

*Gingles,* 478 U.S. at 36–37, 106 S.Ct. at 2758–59 (quoting Senate Report at 28–29).

**27.** Additionally, their intent theory fails because it is almost exclusively focused on the appointment and retention scheme, which has since been modified in a way that belies any racial discriminatory intent. To the extent the Voters' intent theory is directed at the at-large, county-wide voting scheme for county division judges, it suffers from a complete failure of proof.

**28.** The Voters attempt to raise a factual issue about whether Judges Kimbrough and Carter were minority-preferred candidates. That effort fails in light of their lack of response to the requests for admissions forwarded to them in 1993 by the Commission and the Judges, and their apparent concurrence with the Court deeming the matters in those requests admitted. *See* Intervening Def's Mot. to Deem Requests Admit-

over, after looking at a total of fifteen elections, both judicial and non-judicial, Henderson found evidence of legally significant racial polarization in only two elections, and those were both primaries. Henderson Dep. at 163. As defendants note, in each non-judicial general election pitting a minority candidate against a white candidate that was examined by Henderson, the minority candidate won with a majority of both the black and white votes. *See* Henderson Aff., Tables 7 and 9.

The Voters claim that special circumstances account for the few minority candidate successes in judicial elections, and that the Court should thus find that racial polarization is sufficiently at work to meet the third *Gingles* precondition. The special circumstances to which they allude are that Carter won the primary because of a political "deal" whereby the party would not run anyone against him, and that Carter was a candidate preferred by whites although acceptable to blacks. The Voters have offered no evidence to support these assertions, nor any explanation of how a political deal not to oppose an African–American candidate amounts to circumstances that nullify his election to office. With Kimbrough, the Voters contend, the fact that he ran unopposed as an incumbent constituted special circumstances. However, the Voters fail to explain how this common feature of retention elections qualifies as a special circumstance. The Voters also fail to explain why Kimbrough was retained when Lake County voters clearly knew how to "diselect" a judge, as evidenced by their rejection of Judges Giorgi and Mears in 1978 and 1992, respectively. Instead they turn the Court's attention to the exogenous election results, and contend that the Court can easily find significant racial polarization in those elections.

The results of exogenous elections may be probative of the issue of racial polarization if there is nonexistent or sparse data from elections involving the challenged· office. *Magnolia Bar Ass'n v. Lee,* 793 F.Supp. 1386, 1399 (S.D.Miss.1992), *aff'd,* 994 F.2d

1143 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993). In addition, to be relevant the data from exogenous elections must be shown to correlate to the challenged elections. *Meek v. Metropolitan Dade Cty., Fla.,* 985 F.2d 1471, 1483 (11th Cir.1993); *Lucas,* 967 F.2d at 552; *cf. SCLC,* 56 F.3d at 1293 (commending the trial court for considering all relevant, circumstantial evidence, including "political races generally—white on black and white on white—in seeking to determine the question" of racial polarization). Despite the Intervenors' argument that the Court should not look to the results of exogenous elections to determine polarization, this Court has done so.

However, because there is no evidence whatsoever of racial polarization in the context of county division judicial elections, or judicial elections in general, the Court is cautious in attributing significant weight to exogenous results. *See Clark v. Roemer,* 777 F.Supp. 445, 460 (M.D.La.1990); *Williams v. State Bd. of Elec.,* 696 F.Supp. 1574, 1581 (N.D.Ill.1988). Each electoral practice or device stands alone. If one particular practice is challenged, the amount of racial polarization that combines with that practice in a way that dilutes the minority vote should be measured in terms of the context. *Williams,* 696 F.Supp. at 1581. Even if racial polarization has occurred in elections in which the winners will carry the agenda of their supporters to a collective body, that does not translate directly into racial polarization affecting the election of judges.

Moreover, every time a minority candidate has run for a judicial election in Lake County, he has won. That evidence sets the standard that the Voters' evidence from exogenous elections must reach in order to outweigh the complete absence of racial polarization in the challenged elections. Voters may be racially polarized about who they want to elect for State Representative, for example, but not about who would make the best judge. In fact they have demonstrated

---

ted. Because the operation of the federal rules alone is sufficient to deem matters contained in requests for admissions admitted, this Court need not order same. *See* Fed.R.Civ.P. 36(a).

The subject matter of those requests was whether Judges Kimbrough, Carter and Moss were candidates of choice of African–American voters.

that phenomenon here, according to the evidence of record.

Regardless of the weight given, the record here contains very little evidence from either kind of election to support a finding of racial polarization. Viewed in a light most favorable to the Voters, the evidence reveals that from the time the Superior Court of Lake County was first created until 1987, one of the ten judges on the court was black, Judge Kimbrough. He was retained by majority vote of both blacks and whites in 1976 and 1982. In 1987 Judge Kimbrough died. He was replaced by a *pro tem* judge who was also black and who served until a replacement could be appointed.

In 1988, the general assembly changed the Lake County Court into the county division of the Lake County Superior Court, establishing that these judges would be elected by popular vote on an at-large, county-wide basis. In 1990 a black judicial candidate successfully opposed a white incumbent for a seat on the county division of the Lake County Superior Court. That was Judge Carter, and he stayed on the bench until 1992, when he resigned. In 1991, a white judge resigned and was replaced by a black judge.

The Voters argue that this evidence is too sparse to support any conclusions about whether racial polarization exists, and thus point the Court not only to exogenous elections, but also to the fact that in the entire Twentieth Century, in a county that has a significant black population, only two blacks have been elected to the Lake County bench. Plf's Response at 105. While admitting that "blacks may win more often than they lose," the Voters claim that blacks have "disproportionately fewer opportunities to do either." *Id.* at 106. Even if true, the alleged lack of

opportunity must be proven, not merely claimed.[29] It also must be proven that the county-wide, at-large system of electing judges is the cause of the blacks having fewer opportunities to run a candidate. *See Williams,* 696 F.Supp. at 1581 (stating that if plaintiffs choose to prove the slating process is biased against minorities, they must show that but for the at-large system, the slating process would not deprive them of the opportunity to select their preferred candidate).

The exogenous results offered by the Voters, viewed in a light most favorable to them, reveal that in every non-judicial election with only white candidates, the winning candidate received a majority of both the black and the white vote. For example, in the November, 1990, Secretary of State election, 92.91% of blacks and 58.66% of whites in Lake County voted for candidate Hogsett, who won the county election against a white opponent.[30] Henderson Aff., Table 4. In exogenous elections in which a black candidate ran against a white candidate, the results were the same, the winning candidate received a majority of both black and white votes. *See* Henderson Aff. Tables 7, 9. For example, in the November, 1990, race between Brown, who is black, and Heiser, who is white, for Supreme Court Clerk, Brown received 99.01% of the black vote and 55.29% of the white vote. Henderson Aff., Table 7. Brown won that election.

The Voters contend that rather than just look at the fact that a bare majority of white voters chose the same candidate as the black voters, the Court should consider that blacks chose Brown in proportionately greater numbers than whites did. In other words, a significantly higher proportion of white voters did not vote for Brown than the propor-

---

**29.** With respect to the Voters "proof" of lack of opportunity to participate in the political process, the Court is hampered in its analysis by the Voters' non-compliance with L.R. 56.1. The purpose for requiring litigants to designate the specific evidence supporting their contentions regarding disputed facts is to facilitate an efficient review of the record. That purpose is even more important where, as here, the record is voluminous. For example, the Voters claim that black candidates have disproportionately fewer opportunities to run for judicial elections, and that white voters are not called upon to defeat minor-

ity-preferred candidates "because the preferred candidates of the black residents of Lake County never make it to the ballot." Plfs' Tender of Statement of Mat. Facts, ¶¶ 529–30. No citations were given to any evidentiary materials in support of these proposed factual findings, making them bare conclusory assertions.

**30.** For purposes of clarity, the Court will recite the bivariate regression statistical data from the tables accompanying the Voters' expert's affidavit.

tion of black voters who scorned him. Although this fact demonstrates that whites and blacks do not all vote the same way, it does not prove racial polarization to the extent necessary to establish the third *Gingles* precondition. To satisfy this precondition, whites must vote sufficiently as a voting bloc to enable them to usually defeat the minority-preferred candidate. A review of the plaintiffs' proffered evidence does not reveal any support for finding racial polarization to that extent.

Even if this Court found that racial polarization had occurred to an extent that satisfied the third *Gingles* precondition, that finding would not automatically lead to a conclusion that § 2 was violated. In light of the state's substantial legitimate interest in linking the jurisdiction of the county division judges with their electoral base, *Houston Lawyers Ass'n*, 501 U.S. at 426, 111 S.Ct. at 2381 (stating that the state's interest in maintaining an electoral system is a legitimate factor to consider in the totality of the circumstances analysis); *League of United Latin Amer. Citiz. v. Clements*, 999 F.2d 831, 872 (5th Cir.1993) ("*LULAC*"), *cert. denied*, —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994), (noting that the state's interest in structuring their judiciary is at least substantial), such a finding would not be enough to avoid summary judgment.

To outweigh the state's interest in the at-large, county-wide elections of judges who have county-wide jurisdiction, the Voters need more than marginal evidence of vote dilution. *LULAC*, 999 F.2d at 876 (balancing state's substantial interest requires substantial proof of dilution). Viewing the evidence of record, the Voters have no evidence of racial polarization in judicial elections and very little evidence of it in any other elections. Had this evidence allowed the Voters to meet the *Gingles* preconditions, it would not be enough to outweigh the state's interest.

In fact, this Court finds that the Voters have not met that third precondition. However, even if they had, it would have been with such marginal evidence that when considering the totality of the circumstances, it would not suffice to establish a vote dilution

claim. That analysis would necessarily include considering the state's significant interest, an apparent trend of appointing minority judges, and the recent change in the law relating to the composition of the Commission. Consequently, it is unlikely that the Court would be able to find even marginal vote dilution.

The Voters contend that the automatic change of venue rules that were in place in Indiana until 1992 disprove the assertion that the state has a substantial interest in linking the electoral base for county division judges with their jurisdiction. Linkage between the electoral base and a court's jurisdiction is not just a matter of convenience, it is a matter of the substance and structure of the court. *LULAC*, 999 F.2d at 875–76. The purpose behind the linkage is so that judges whose decisions affect everyone in the county will be accountable to everyone in the county. Just because a change of venue rule gave individual litigants what was, in effect, an additional vote for or against a specific judge does not mean that the state's interest is invalid. In fact, the venue rule would actually function to enhance the accountability of the judges. The Voters' contention to the contrary is erroneous.

### 2. *Constitutional Claims*

As mentioned in the Count I discussion of the Voters' Constitutional claims, proving a violation of the Fourteenth and Fifteenth Amendments requires the showing of an intent to discriminate. It also requires proof that the challenged law results in discrimination. Directing those inquiries to the county-wide, at-large system of electing judges in the county division reveals no discernable intent to discriminate against a protected class or intent to abridge or deny their right to vote. The evidence offered by the Voters to prove their Constitutional claims focused almost exclusively on the state's choice of an appointment and retention system for the other Superior Court division judges. The Court can discern no connection between the propounded facts regarding that choice, and the current system of electing county division judges.

The Voters suggested that use of single-member districts in Marion County allows a greater number of minority judges to be

elected, but failed to proffer any evidence in support of that contention. Also absent was any evidence that would tend to show that the state chose the at-large system in Lake County for a discriminatory reason. For all of these reasons, and because the system has not yielded a result of defeating minority-preferred candidates, the Constitutional claims should be dismissed.

## IV. CONCLUSION

Several dispositive motions are pending before the Court and in combination they have the potential for resolving this entire action. The motion to dismiss Count II of the Complaint, which was countered by the Voters' motion for partial summary judgment on that count, is well taken. Section 2 of the Act does not apply to claims relating to the appointment process of a hybrid system of judicial appointments and subsequent retention elections. Therefore, the Voters' claim of a violation of § 2 by the selection of attorney members to the Commission should be dismissed. With respect to the Voters' claims that the method of allowing only attorneys to select attorney members to the Commission violates the Fourteenth and Fifteenth Amendments of the Constitution, those claims must also fail. No fundamental rights are implicated nor suspect classes created by the current system, and the state's decision to let only attorneys vote for the attorney Commission members is rationally related to a legitimate purpose. The Intervenors' motion to dismiss Count II is, therefore, well-taken and should be, and hereby is, **GRANTED.** Because the dismissal of Count II applies whether the defendant is the Commission members, or the judges, or the Lake County Election Board, this Court's ruling on Count II applies to all defendants.

With respect to the Intervenors' motion for summary judgment on Counts I and III, which was joined by the Lake County Election Board members, the Court finds that there are no genuine issues of material facts and that the Intervenors and defendants are entitled to judgment as a matter of law. The allegation in Count I that the current system of appointing and retaining judges in the civil, criminal and juvenile divisions of the Lake County Superior Court denies African–Americans the right to elect judges of their choice, in violation of § 2, is affected by the recent change in Indiana law. Because the determination of a § 2 violation requires careful and full consideration of all the circumstances surrounding a challenged electoral practice, the Court finds that insufficient evidence is available about the effects of the new law, rendering a decision premature and unnecessary.

The Constitutional claims raised in Count I are also affected by the new law. The Court should not rule on the constitutionality of an electoral system that has changed, and changed in a way that reflects greater concern for the participation of minorities, when the effect of those changes cannot be discerned. For all of these reasons, the Intervenors' motion for summary judgment on Count I should be, and hereby is, **GRANTED.**

Count III alleges that the county-wide, at-large elections of judges to the county division of Lake County Superior Court dilutes the voting strength of African–American voters. No factual disputes exist with respect to this count, and the evidence presented does not reflect racial polarization to an extent that would satisfy the third *Gingles* precondition. All three preconditions must be met before the Court must examine the totality of the circumstances to determine if vote dilution occurs. Because the Voters could not meet the preconditions, and because even if they had it would have been by such marginal evidence that they would likely not have succeeded in proving vote dilution by a totality of the circumstances assessment, the Court finds that the Intervenors motion for summary judgment on Count III should be, and hereby is, **GRANTED.**

The Court has found that summary judgment should be granted in favor of all defendants. Consequently, the Voters' cross-motion for summary judgment on Counts I and III should be, and hereby is, **DENIED.** Several motions to strike are also pending. The motion to strike the Voters' motion for partial summary judgment on Count II has been rendered moot by the Court's grant of the defendant's motion to dismiss that count. The motions to strike various pieces of evidence offered by the Voters in connection with the summary judgment motions were **sustained in part** and **overruled in part.**

The Court has stricken all evidence that amounts to inadmissible hearsay, lay opinions, speculations, or conclusions as to ultimate facts. In addition, the Court disregarded any evidence that had not been properly designated by the Voters as supporting a particular material fact.

Had this Court found that the Voters' had successfully proven a violation of the Constitution or § 2 of the Act, it would have ordered the Indiana General Assembly to propose a remedy for the situation. While this action was pending, the state legislators enacted new legislation that seems aimed at addressing the Voters' concerns, as well as the concerns of others.

Whether the changes in the law will actually work to increase minority participation in the judicial electoral process in Lake County remains to be seen. The changes are too recent to be able to assess their effect, which is what a court must do in order to determine whether an electoral practice violates either the Constitution or the Voting Rights Act. At present, however, nothing further need be done to address the Voters' concerns about the judicial election system in Lake County.

IT IS SO ORDERED.